**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

COALITION OPPOSING GOVERNMENTAL SECRECY ("COGS"); CHILDREN OF THE COURT, Missouri nonprofit corporations; JUDICIOCRACY LLC, a Missouri limited liability company; and Dr. EDWARD "COACH" WEINHAUS, individually, as a member of the general public, and as an attorney licensed to practice law, on behalf of himself and all other attorneys similarly situated,

*Plaintiffs,*

v.

HON. JILL ROSE QUINN, in the official capacity and LEA S. GUTIERREZ, individually and in her capacity as Administrator of the Attorney Registration and Disciplinary Commission of Illinois,

*Defendants.*

Case No. __________

**CLASS ACTION COMPLAINT**
*Trial by Jury Demanded*

## INTRODUCTION

*Comity* presupposes a functioning, independent state judiciary worthy of deference. Where, as here, the state judiciary is an instrument of the violation – where the head of the disciplinary body uses authority to suppress speech, news coverage, court reform and transparency, where the body enters unauthorized orders to prosecute critics, where a judge closes the courtroom without basis, and where the state's own hearing panel chair has indicated

the disciplinary body's misdeeds – comity is inappropriate. Abstention doctrines govern the *timing* of a federal court's exercise of jurisdiction; they do not license its surrender[1]

## JURISDICTION AND VENUE

1. This case arises as a Federal question, 28 U.S.C. § 1331. Claims arise under the First and Fourteenth Amendments, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201–2202. Venue is proper under § 1391(b).

2. To the extent 42 U.S.C. § 1983 provides that injunctive relief against a judicial officer for an act taken in a judicial capacity shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable, Plaintiffs seek declaratory relief as to each claim against Judge Quinn both as a predicate to, and independently of, the injunctive relief requested herein.

## PARTIES

3. Plaintiff Coalition Opposing Governmental Secrecy ("COGS"), a Missouri non-profit corporation registered as a 501(c)(3) under the US tax code is an organization dedicated to combating governmental secrecy and promoting public access to governmental proceedings and records. COGS attempted to attend the hearing at issue, was represented by counsel, and was removed from the proceeding.

4. Plaintiff Dr. Edward "Coach" Weinhaus ("Dr. Weinhaus") is the Litigator-in-Chief of COGS, the Executive Director and Founder of Children of the Court, a principal of Judiciocracy LLC, and a member of the general public who sought to observe a public hearing before Judge Quinn.

[1]Although a transgender family law judge is a remarkable judicial assignment, Children of the Court has not yet made public its position on the propriety of the assignment in question here. Numerous Children of the Court members have expressed concern about it.

5. Dr. Weinhaus was selected by COGS because he is one of Illinois' leading transparency attorneys with lawsuits in more than half of Illinois' counties and winner of penalties in at least five cases against the Village of Dolton. Dr. Weinhaus is not a director of the organization.

6. Dr. Weinhaus serves as lead counsel for Shelby County Treasurer Erica Firnhaber's case against entities in Shelby County for transparency violations in a corruption investigation.

7. Dr. Weinhaus recently successfully represented COGS in unsealing the divorce records of Alderman Byron Sigcho-Lopez. When the Alderman falsely claimed that Dr. Weinhaus distributed sealed court documents via his campaign team, Dr. Weinhaus, his co-counsel Adam Florek, and COGS sued Alderman Sigcho-Lopez for defamation, in a matter now pending before the Cook County Chancery Court, Case No. 2026CH08230.

8. Plaintiff Children of the Court is a Missouri nonprofit corporation whose mission is to assist adult children of divorced parents visit the courtrooms and judges that impacted their youth and to advocate for transparency and accountability in the domestic relations courts, including intelligent judicial assignments.[2] Children of the Court is a member of COGS.

9. Plaintiff Judiciocracy LLC is a Missouri limited liability company that publishes *ALABnews* and *AbusiveDiescretion* – the nation's leading publications in attorney and judicial misconduct, respectively. Judiciocracy is a member of COGS.

10. Defendant Hon. Jill Rose Quinn ("Judge Quinn") is a judge of the Circuit Court of Cook County in the Domestic Relations Division. Upon information and belief, Judge Quinn was

[2] The Undersigned Counsel is admitted to practice before the Northern District of Illinois but is not subject to the disciplinary authority of Ms. Gutierrez. Any judge in this matter who is subject to Ms. Gutierrez' discipline will be subject to a motion for disqualification and recusal due to that precise matter being at issue. Further, Cook County State's Attorney Ethics Attorney Meriel Coleman is one of the 'visitation observers' – Ms. Coleman filled Judge Perry's role upon Judge Perry's departure. Due to Judge Perry's considerable relationships with the parties involved (Ms. Coleman and Ms. Gutierrez were ARDC attorneys during Ms. Perry's tenure at CCSAO), Judge Perry should consider immediate recusal.

formerly known as Peter Lombardo. Judge Quinn presided over the hearing from which Plaintiffs were excluded, issued the verbal closure order, and has withheld the written order, which as of September 18, 2026 had not appeared on the public docket. Sued in official capacity only.

11. Defendant Lea S. Gutierrez ("Gutierrez") is the Administrator of the Attorney Registration and Disciplinary Commission of Illinois ("ARDC").[3] She is a party to the Underlying Proceeding and exercises disciplinary authority over licensed attorneys in Illinois, including every other attorney involved in that proceeding. She is a public figure and political figure given her significant roles and positions as a 'diversity and inclusion' officer. Plaintiffs sue her individually and in her official capacity.

## FACTS

### The Closure

12. On September 9, 2026, a hearing was scheduled in the Underlying Proceeding before Judge Quinn. It was noticed on the public docket and presumptively open as were all prior dates.

13. Dr. Weinhaus was present in the courtroom via Zoom like all other participants and including members of the public. He listed himself as an attorney and an "Observer" with his full name and camera on. When Judge Quinn asked, he identified himself, and noted he is an attorney and was viewing as an observer only. Dr. Weinhaus's attorney was also present. COGS was represented by counsel and also attempted to attend.

[3] None of the Plaintiffs have described *gender transition and genital mutilation* as a mental disorder. It is the court in the underlying proceeding that ordered mental health consequences for the parent who allegedly discussed *gender transition and genital mutilation* in front of the children. Plaintiffs' reference to the subject matter is descriptive, not diagnostic, and reflects the parties' and the court's own characterization of the issues in the Underlying Proceeding. Plaintiff Children of the Court believes it is just as likely that the callous manner in which a parent's rights were removed could cause a mental break.

14. Before any discussion of closure, Judge Quinn demanded to know who Dr. Weinhaus's clients were. Dr. Weinhaus disclosed several of them including Plaintiffs. Judge Quinn further demanded to know the purpose of Dr. Weinhaus' attorney's presence. Only after this inquiry did Judge Quinn turn to the GAL and, in a manner indicating a leading question, inquired whether the GAL wanted the proceeding closed.

15. The GAL then requested closure. The GAL filed no motion, cited no authority, and identified no interest that would be prejudiced by public access that was not already public in every way.

16. Judge Quinn noted that Judge Quinn's court was open for Zoom to the public for all *other* cases other than the Underlying Proceeding to the Plaintiffs and their attorneys.

17. Judge Quinn then closed the courtroom to the observer Plaintiffs and their attorneys without findings, without identifying an overriding interest for a complete removal including what the court would order, without considering alternatives, and crucially without noting the least limiting way to close the courtroom for only sensitive matters related to children themselves.

18. At no time did Judge Quinn make an on-record finding that closing the courtroom was in the best interests of the children. Nor could Judge Quinn do so given the dramatic personal events recounted by Gutierrez. No particularized reason was stated for excluding all observers for the entire proceeding, and no narrower alternative was considered. The only basis for closing the doors was protecting Judge Quinn's personal involvement in the issues in the case and Judge Quinn's subservience to Gutierrez, infra.

19. The Plaintiffs and their attorneys were all removed from the courtroom.

**The Closure Was Selective and Targeted**

20. Judge Quinn permitted the Plaintiffs, their attorneys and other members of the public to remain in the Zoom courtroom for other cases heard that day. Judge Quinn expressed no comparable concern for the children in any of those other cases.

21. The observers were removed *only* for the Underlying Proceeding case. The distinguishing feature of this case - the feature not present in the cases the observers were permitted to see - was the presence of discussion of *gender transition and genital mutilation* (the actual words used by Gutierrez in her public filing include cutting male genitalia off – see below; this Complaint adopts the less inflammatory generalized term) on the record[4].

22. Judge Quinn knew that *gender transition and genital mutilation* had been at issue in this case and that those subjects were not at issue in the other matters Plaintiffs were permitted to observe that day. The selective closure demonstrates that scrutiny of Judge Quinn's performance related to the subject of *gender transition and genital mutilation* was a purpose of the closure.

**Any Possible Reason for Closure Was Moot; Incendiary Information Was Already Public**

23. Every category of information the GAL could seek to protect was already in public court filings. Information on the public docket cannot constitute an overriding interest, and its public availability heightened rather than lessened the need for particularized findings and narrow tailoring.

a. Both parties to the Underlying Proceeding discussed the children involved;

b. Both noted the mental health issues discussed by the Court;

c. Both parties discussed supervised visitation;

d. In a shocking display of public exposure of one's own children to the horrors of the domestic relations proceedings, both parties even named their children in filings after

[4] Although the children's names are traditionally male ones, the 'daughter' called the police on Gutierrez's ex-spouse.

the discussion of *gender transition and genital mutilation* on the court record had begun publicly;

e. Worse yet, the parties' bicker over the findings of a DCFS investigation Gutierrez names in her motion before agreeing they are "Unfounded" – yet Gutierrez remained disputing the endangerment issue she had earlier raised publicly;

f. The mental health so-often raised by the parties is a veritable public mud-slinging, including Gutierrez claiming *gender transition and genital mutilation* discussion to earn a suspension of a custodial parent's visitation;

g. Given Gutierrez' position and the below-facts about Judge Quinn, losing that would drive any loving parent crazy. As apparently it did as the parties openly discussed a mental health hospitalization;

h. In fact, Gutierrez even fought against an informational protective order on August 17, 2023, leaving more matters open than in a case where they would otherwise be private or held solely by the GAL and Judge Quinn;

i. Gutierrez admits to having one of her own children[5] call the police on her ex-husband and made public that the parents both discussed with the children, "a story about a man drugging young girls to rape them";

j. But ultimately, unlike a truly contentious proceeding or where there are mental health interventions for the children (which would be a matter of public record had they existed), Gutierrez agrees to supervise her ex-spouse's parenting time, suggesting a bizarre use of public resources under court supervision were there a serious mental health risk. (Dec. 12, 2023).

k. In short, an incendiary one-way fight initiated by Gutierrez's uncanny coincidental timing to gain supervisory powers over her ex-husband by catering to a transgender judge, whom Gutierrez also oversees, which occurred within days of that judge's assignment to a peaceful post-decree matter and on which Judge Quinn granted emergency relief the next day, with police and DCFS involvement yielding no matter of consequence, and the involvement of *gender transition and genital mutilation* topics raised by Gutierrez, yielding total domination by Gutierrez over her ex-spouse, is a matter already so public that a total courtroom closure upon transparency, media and court reform interests deserves the utmost scrutiny.

---

[5] https://prairiestatewire.com/attorney-sues-illinois-judges-association-ardc-officials-alleging-judges-group-rigs-discipline-to-silence-critics "Attorney sues Illinois Judges Association, ARDC officials, alleging judges' group rigs discipline to silence critics" *PrairieStateWire*, September 9, 2026.

24. Court proceedings in the matter were all open to the public and none listed as closed by any order prior to September 9, 2026. No proceeding had ever been ordered closed in advance. This matter was not being held in private but instead in public – up until Plaintiffs arrived.

25. Given the mudslinging, use of the children's names, *gender transition and genital mutilation* discussions, hospitalizations, DCFS (unfounded tomfoolery) all in 2023 - and no motions for psychological evaluations of the children on record, it is evident that this was just a normal status proceeding like the thousands of others that occur in Cook County Domestic Relations on a daily basis. Nothing on the public docket identified any issue requiring total closure in advance.

26. Whereas prior orders listed status for parenting time (even supervised), the September 9, 2026 notice was just a general Status and also open to the public, with the only prior substantive order in the prior year and a half discussing, "Counsel and GAL shall confer within 30 days and discuss the status of transportation…"

**No Narrowing Was Considered**

27. At no time did Judge Quinn ask whether *all* of the issues to be discussed would be non-public.

28. At no time did Judge Quinn consider closing the courtroom for only those portions - if any - that involved genuinely non-public information while keeping the remainder open.

29. No partial closure, pseudonyms, redaction, or any alternative to total exclusion was discussed or considered.

30. And absolutely no finding of the children's best interests was made - on or off the record.

**The Oral Pronouncement of the Order Was Suppressed**

31. Whatever substantive issues were discussed, the portion of the proceeding in which the court pronounced its order, which presumably occurred behind closed doors for the first time in the case - would have been public in all circumstances. The oral pronouncement of a court's ruling is not a confidential matter. The observers should have been permitted to witness at least the oral rendition of the court's order (hereafter, "Secret Order.")

32. They were not.

33. The exclusion of observers from the issuing of the order portion of the proceeding, combined with the continued absence of any written order on the public docket as of September 18, 2026, is consistent only with an intent to suppress the order and information about the proceedings.

34. The Secret Order, which includes the order closing the courtroom to the Plaintiffs, has never been reduced to writing, and as of September 18, 2026 no written order appears on the public docket.

**The Written Order Is Being Deliberately Withheld**

35. For the preceding 18 months, Judge Quinn entered a same-day (or +1 day once) written order after every court date in this case.

36. On the instant occasion the courtroom was closed by the Court's own motion as recounted here, and no written order has been entered - not that day, and not at any time before this lawsuit was filed, nine days after the court proceeding.

37. The public and the Plaintiffs are being denied access to the Court's own record of its proceedings to deny it evidence for this very action which can now be manipulated.

38. Plaintiffs allege that an order will be entered after this case is filed to attempt to reduce or eliminate liability. No such after-the-fact order would erase the period during which Plaintiffs

were denied any written record of the September 9 proceeding, or resolve the lawfulness of the closure at the time it occurred.

39. But without redress, the withholding of public access will keep happening.

**Future Dates Have Been Concealed**

40. No future hearing dates have been listed on the public docket, and as of September 18, 2026 none appears. The court undoubtedly knows when future proceedings are scheduled, but the public does not.

41. Nor does the docket reflect that the case was stricken from the call or that any scheduling order was entered.

42. The concealment of future dates is a continuation of closure while hiding public records and open courts from the public.

**Judge Quinn's Personal Conflict of Interest**

43. The hearing involved a case where the parties had previously put at issue parental rights and *gender transition and genital mutilation* as those subjects were discussed related to issues surrounding the children in the Underlying Proceeding.

44. Gutierrez has made it central to her successful removal of significant parental rights of a custodial parent. She shared the following quotes in her emergency request on May 18, 2023 just as Judge Quinn first joined the Domestic Relations Division:

> **"I can't abuse our children anymore"**
>
> **"I'm willing to chop my dick off to save our son's life."**
>
> **"I'm abused and I don't know how to speak. I'm sorry"**

45. These topics bear a direct personal relationship to Judge Quinn's own gender transition (and presumably identity transition from Peter Lombardo) - a part of Judge Quinn's election that is publicly known and Judge Quinn discusses.

46. It is indeed one very remarkable aspect of Judge Quinn, who was interviewed about it – then very much into openness and lauding Judge Quinn's own expertise in counseling other judges in the Domestic Relations Division about the issues:

> **I just joined the Domestic Relations Division – I have educated other judges about what happens with parenting time when kids are transgender, or when parents are transgender.**
>
> I always feel like you can't visualize who a transgender person is until you know them. **And you can't know them unless you permit them to be visible. But once you know them and once you're able to see the person, rather than the aura of whatever panic or fear you create around them, you become more accepting.** I am very optimistic when I think about where we've come from, from my childhood to now. There's a universe between then and now. There's some backtracking, but I think that fear can gradually be eased as long as we keep an open mind. **As long as we don't shut down legislative action, and how democracy works.**
>
> **The more you include people, the more seats at the table you get**…I was talking to [a trans person] a few years ago who ran for a really minor office, and she[sic] won the office. Maybe that's not going to affect legislation, but it's someone who's in office who represents us.
>
> And in the Trump years… **the courts were the first line of defense. We have to look at how judges are elected, and we have to support people with open minds in those positions.** That will go a long way to help.
>
> I think [the recent wave of bills] is a backlash, I think that it's a distraction… [and] I think one of the reasons for the backlash is that people are getting confident. You can casually say, this is my wife, these are my children… And maybe [people] thought things were moving too fast. **I, for instance, knew I was transgender at the age of four. When I told people at the age of 46,** they had ten minutes to get used to it. I had been getting used to it for years.
>
> We need to give people a little bit of slack. Not to say that we should yield, but we need to give some people a little bit of leeway in our lives. There's a certain knee jerk reaction sometimes. [**But] if people are acting in good faith, then everything else is easy**… **The key is to be visible and to be confident and to let people know that we exist** –

that we eat, we have mortgages, we pay the same high gas prices that everybody else does.

47. That interview was published May 18, 2023 at The LBTQ+ Bar - https://lgbtqbar.org/bar-news/pride-interview/hon-jill-rose-quinn/ .

48. At 1:03 pm the same day, Gutierrez filed her emergency motion related to *gender transition and genital mutilation* in front of Judge Quinn who granted it the following day removing Gutierrez's ex-spouse's access to his children.

49. Judge Quinn has a personal motive to suppress public observation of a proceeding related to how Judge Quinn performs relates to cases involving *gender transition and genital mutilation*.

50. Judge Quinn did not disclose the conflict, recuse, or refer the closure decision to another judge at any time including when the issue became the subject of the media coverage in open court on September 9, 2026 upon Plaintiffs' announcement.

51. In fact, it was only the case involving *gender transition and genital mutilation* discussion that Judge Quinn prevented from public access – Plaintiffs were alowed access to all others including others where children's issues were presumably involved.

**Gutierrez and the ARDC**

52. Gutierrez is a public figure and the head of the ARDC. She exercises disciplinary authority over every other attorney in the Underlying Proceeding, creating a coercive dynamic in which no attorney-party dare object to her preferences.

53. Judge Quinn's own actions as a licensed attorney are subject to proceedings brought by Gutierrez, as Judge Quinn is an active-license holder in Illinois. As a matter of record, then, the judge who closed the courtroom sits under the disciplinary authority of the litigant for whose

benefit the courtroom was closed. That power structure is, without question, a motivating factor in the closure.

54. Gutierrez has a documented history of using her institutional authority to break procedures and stifle the speech of the organizational Plaintiffs and of Dr. Weinhaus.

55. A day prior to the closure, Gutierrez had been sued for doing just that at the behest of what Dr. Weinhaus claims is an illegal judge's business league (repeating the same claim made by prior members of the Illinois Supreme Court before they all joined it – according to the business league itself). See Cook County Case #2026CH08682.

56. By the morning of the closure, a news story had been published about the lawsuit. Dr. Weinhaus, the attorney being 'disciplined' for helping the Plaintiffs, had been interviewed and quoted. Presumably, based on the public filing and the external news interest, Gutierrez and Judge Quinn were aware of the action at the time of the closure.

57. They sought to restrict Dr. Weinhaus as an attorney and then even his attorney to prevent him from learning how Gutierrez conducted herself in front of a judge over whom she had disciplinary authority.

58. Dr. Weinhaus was immediately vindicated elsewhere in his attempts to out Gutierrez.

59. The day after the closure, a hearing board panel chair required the entry of an order in a disciplinary proceeding stating on the record that an order had previously been entered in that chair's name without that chair's express authorization.

60. That admission establishes that either Gutierrez or another ARDC participant under her control are implicated in issues related to the criminal statutes enshrined in 720 ILCS 5/Article

32 of the Illinois Criminal Code, Interference with Judicial Procedure (in connection with three of the four Plaintiffs' speech - not COGS). See 720 ILCS 5/32-1, 32-6, 32-7, 32-8, 32-11, 32-12.

61. At least four ARDC employees under Gutierrez received a litigation hold letter implicating 720 ILCS 5/Article 32 of the Illinois Criminal Code, Interference with Judicial Procedure to preserve evidence on September 18, 2026 (which could serve as underlying wrongful acts in a conspiracy claim).

62. Also on September 18, 2026, that same hearing panel chair recused himself from the disciplinary proceeding, after being told by the respondent there (Dr. Weinhaus via counsel) that the ARDC providing him the same attorney that Ms. Gutierrez uses implicated *even more* due process concerns in a proceeding where the panel chairs are purportedly independent.[6] (Upon information and belief, the hearing panel chair will be dropped as a defendant.)

**Judge Quinn Knew Who Was Watching**

63. Judge Quinn was aware that the closing involved COGS, Children of the Court, Judiciocracy LLC, and Dr. Weinhaus. Judge Quinn ordered the closure with knowledge that it would prevent reporting on the court's handling of the case.

64. Judge Quinn was aware that the attorneys being removed from witnessing the case were under Gutierrez's disciplinary authority and sought to protect Gutierrez from their investigations due to Gutierrez's undue influence over Judge Quinn.

65. Judge Quinn's demand to know Dr. Weinhaus's clients before initiating the closure sequence confirms that the identity of the observers – not any legitimate privacy concern – were part of the judge's motivation to kick them out.

[6] It is possible that using the same counsel in a matter that argues that the chair was not independent is proof enough of the underlying claims in that matter which relates to an outside body's dominance of the proceedings.

## CLASS ALLEGATIONS

66. Plaintiff Dr. Weinhaus brings Count VIII of this Complaint as a class action under Federal Rule of Civil Procedure 23(b)(2) on behalf of himself and all others similarly situated. Dr. Weinhaus serves as the sole class representative.

67. In addition to the allegation that Judge Quinn closed the courtroom and hid the Secret Order as a result of protecting Judge Quinn's goings on, (which Judge Quinn did), Plaintiffs allege that Gutierrez's dominance of Judge Quinn, which can be seen throughout the family litigation prior to September 9, 2026, and Judge Quinn's subsequent desire to protect Judge Quinn's disciplinary supervisor (and a favored judicial appointee from the Illinois Supreme Court) from press coverage for the consequence of her litigation "strategy" served as further wrongful Judge Quinn motivation to close the courtroom to Dr. Weinhaus and his attorney.

68. Thus, Gutierrez, the ultimate beneficiary and superior, controlled Judge Quinn's decision.

69. The proposed class is defined as: all attorneys licensed in the State of Illinois who may be subject to disciplinary proceedings initiated, supervised, or influenced by Gutierrez in her capacity as ARDC Administrator, and who have reported on, observed, or publicly commented upon Gutierrez's personal use of the judicial system or who plan to do so on behalf of clients.

70. The class satisfies Rule 23(a).

a. Numerosity: thousands of Illinois attorneys are subject to potential ARDC discipline and are chilled from exercising their First Amendment rights by Gutierrez's documented pattern of retaliatory prosecution and would like to understand how the most powerful among us interact with the judiciary and how they are treated, versus the regular attorneys who do not discipline the judges (like Gutierrez can). When asked if an Illinois attorney would like to know what the ARDC Administrator can get away with in a courtroom in a manner that is highly prejudicial towards her, that answer is going to lead to a large number of Illinois attorneys. Likewise, there are a large number of attorneys who work for media clients who would otherwise be dissuaded from covering or considering covering Ms. Gutierrez given her authority over them;

b. Commonality: the central question - whether Gutierrez uses her ARDC authority to retaliate against attorneys who investigate or report on her personal cases or on judicial misconduct and causes the closure of proceedings to the public as a result - is common to every class member.

c. Typicality: Plaintiffs' claims arise from the same pattern of retaliatory conduct.

d. Adequacy: Plaintiffs and their counsel will fairly and adequately represent the class.

71. The class satisfies Rule 23(b)(2). Gutierrez has acted on grounds that apply generally to the class - using her institutional authority to restrict First Amendment rights to observe and report on unequal treatment before the judiciary, especially in those cases involving herself.

72. Injunctive and declaratory relief barring Gutierrez from participating in prosecutions where she has a personal conflict is appropriate as to the class as a whole.

## CLAIMS FOR RELIEF

### COUNT I — First Amendment Right of Access
### (§ 1983 — Judge Quinn and Gutierrez)

73. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

74. The closure violated the qualified right of public access. No element required for closure was satisfied. The GAL requested the closure with minimal basis not reflective of the case disposition or the issues already in public and that no public closure had been sought or entered before. Gutierrez procured it through coercive influence. Judge Quinn ordered it after first demanding to know who Dr. Weinhaus's clients were, with knowledge that it would suppress reporting by Plaintiffs' publications, transparency efforts, and judicial assignment advocacy.

75. No *limited* closing was considered.

76. No notice was given in advance even though the topic of discussion was known in advance with no prior order reflecting closure.

77. No order was entered in public, but the court almost certainly ordered from the bench *in private* including a following court date or moving the case off-call as is standard practice. As of September 18, 2026, no such order appears on the public docket.

78. Both defendants are state actors who acted to deny Plaintiffs' rights.

**WHEREFORE**, as to Count I, Plaintiffs respectfully request that this Court enter declaratory and injunctive relief, including a declaration that the closure violated Plaintiffs' First Amendment right of public access, a permanent injunction requiring right to access of the courts within the constitutional public right of access, allowable attorney's fees, cost of suit, and such other relief as the Court deems just and proper.

**COUNT II — First Amendment Right of Access to Judicial Records, Orders, and Dockets (§ 1983 — Judge Quinn in Official Capacity)**

79. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

80. The First Amendment right of access is not confined to physical attendance at a proceeding. It extends independently to the judicial records that a proceeding generates — the order the court enters, the ruling it pronounces, and the docket by which the public learns that a proceeding occurred and when the next one is set.

81. Both prongs of the experience-and-logic test are satisfied as to each category of record at issue here. Orders disposing of matters before a court of general jurisdiction have been open to public inspection for as long as such courts have kept records, and the docket sheet is the most basic publicly accessible court record there is. Access to orders and dockets plays a significant positive role in the functioning of the judicial process: it is the only means by which the public

can learn what a court did, test whether the court acted lawfully, and appear at the next proceeding.

82. For the preceding eighteen months, Judge Quinn entered a written order after every court date in this case. Following the September 9, 2026 proceeding, no written order appeared on the public docket, and none had appeared as of September 18, 2026. Plaintiffs were removed before any ruling was pronounced aloud, and no future hearing date has been posted.

83. The result is a judicial disposition that exists but cannot be read, pronounced in a room the public had been removed from, in a case whose next setting the public cannot learn. The public record discloses that a proceeding occurred and nothing whatever about what the court did in it.

84. No overriding interest in withholding the order was identified, no findings supporting non-disclosure were entered on the record, and no consideration was given to redaction, partial sealing, or any alternative short of withholding the court's disposition in its entirety. A qualified right to access a court's orders cannot be defeated by the expedient of declining to produce the order.

85. Pleaded in the alternative and in addition: the withholding also denies Plaintiffs access to the courts. A claim for denial of access to the courts lies where official action conceals information and thereby frustrates a non-frivolous legal claim for which no other remedy exists. Plaintiffs' underlying claims are set out in this Complaint; the withheld order is the court's own record of the very ruling those claims challenge; and no alternative source exists; the proceeding having been closed to Plaintiffs and no transcript of it being available to them.

**WHEREFORE**, as to Count II, Plaintiffs respectfully request that this Court enter judgment declaring that the continued withholding of the written order, the exclusion of Plaintiffs from the

oral pronouncement of that order, and the absence of any publicly posted future hearing date violate Plaintiffs' First Amendment right of access to judicial records, orders, and dockets; declaring that a court may not withhold its own disposition from the public absent an overriding interest identified on the record and narrow tailoring to serve it; enter injunctive relief consistent with 42 U.S.C. § 1983 directing that the September 9, 2026 order be made available on the public docket and that future settings in the Underlying Proceeding be publicly posted; award allowable attorney's fees under 42 U.S.C. § 1988 and costs of suit; and grant such other relief as the Court deems just and proper.

**COUNT III — Due Process: Biased Decisionmaker**
**(§ 1983 — Judge Quinn in Official Capacity)**

86. Plaintiffs re-allege all prior allegations.

87. Judge Quinn's personal connection to the subject matter of the purported purpose of closed testimony - *gender transition and genital mutilation* topics - created an undisclosed conflict requiring recusal, not closure.

88. The selective closure of only the case involving *gender transition and genital mutilation*, while permitting observers for all other cases, confirms the personal motive. The constitutional duty to recuse is not diminished because a judge's personal stake arises from the judge's own identity rather than from a financial interest. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009). The relevant standard is objective: whether "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.*

89. It was Plaintiffs' rights that were abrogated without hearing, notice, opportunity to argue and whose interests are adversarial to Judge Quinn's desire not to be observed in a case of that type – one including *gender transition* and *genital mutilation*.

90. Judge Quinn publicly and proudly advocated for trans-identity positions, similar to the content Gutierrez deployed to win removal of a custodial parent's rights the same day - and then, without disclosure, closed the very proceeding reviewing judicial performance on that topic.

91. That cynical use of closing the courtroom door that protect one's own standing - or worse yet, the powerful - is not tolerable in our constitutional system.

92. The Plaintiffs and Judge Quinn were adversarial, and Judge Quinn denied their rights to open court for Judge Quinn's own personal advantage.

**WHEREFORE**, as to Count III, Plaintiffs respectfully request that this Court enter declaratory and injunctive relief, including a declaration that Judge Quinn's undisclosed personal conflict violated due process, an injunction requiring recusal or disclosure in proceedings touching upon *gender transition and genital mutilation*, allowable attorney's fees, cost of suit, and such other relief as the Court deems just and proper.

**COUNT IV — Common Law Right of Access**
**(Judge Quinn and Gutierrez)**

93. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

94. Courts have long recognized a common law presumptive right to inspect and copy judicial records and proceedings. That presumption applies to court orders and transcripts and may be overcome only upon a specific, particularized showing that competing interests substantially outweigh the value of openness. Defendants have made no such showing.

95. The September 9, 2026 proceeding, the order presumably secretly pronounced at its conclusion, and the written order that should have followed are all judicial records subject to the common law presumption.

96. The deliberate refusal to reduce the order to writing, the suppression of its oral pronouncement, and the concealment of future hearing dates each independently violate the common law right of access.

**WHEREFORE**, as to Count IV, Plaintiffs respectfully request that this Court enter declaratory and injunctive relief vindicating the common law right of access to judicial proceedings, orders, and records, allowable attorney's fees, cost of suit, and such other relief as the Court deems just and proper.

**COUNT V — First Amendment Retaliation by Gutierrez**
**(§ 1983 — Gutierrez Individually)**

97. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

98. Gutierrez has a pattern of using her ARDC authority to suppress Plaintiffs' speech (excepting COGS).

99. She or her staff got caught a day later having entered an unauthorized order to prosecute Plaintiffs' speech and to protect the *reputation* of those who help her prosecution (judges not coincidentally, like Judge Quinn) even though they have immunity; the hearing board chair stated on the record that the order had been entered in his name without his express authorization.

100. The courtroom closure barring Plaintiffs is the latest act in a campaign of retaliation for protected speech.

**WHEREFORE**, as to Count V, Plaintiffs respectfully request that this Court enter judgment against Gutierrez, including compensatory and nominal damages, injunctive and declaratory

relief barring further retaliation, costs of suit, allowable attorney's fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**COUNT VI — Due Process: Coercion Through Disciplinary Authority (§ 1983 — Gutierrez Individually)**

101. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

102. Gutierrez exercises ARDC disciplinary authority over every other attorney and Judge Quinn, deterring objection to the closure and distorting the proceeding.

103. As Plaintiffs were seeking to report on Gutierrez and are in that sense adversarial to her since she seeks to stifle press speech, her influence was an act in denying their due process.

**WHEREFORE**, as to Count VI, Plaintiffs respectfully request that this Court enter judgment against Gutierrez, including compensatory and nominal damages, injunctive and declaratory relief, costs of suit, allowable attorney's fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**COUNT VII — First Amendment Chilling Effect (§ 1983 — Judge Quinn and Gutierrez)**

104. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

105. The closure, the suppressed order, the concealed future dates, Gutierrez's pattern, the (likely) staffer's crime, and the removal of Plaintiffs' and Dr. Weinhaus's attorneys - taken together - chill the public's right of access and Plaintiffs' right to observe and report.

**WHEREFORE**, as to Count VII, Plaintiffs respectfully request that this Court enter declaratory and injunctive relief, including a declaration that Defendants' combined conduct has created an

unconstitutional chilling effect on protected speech and the exercise of the right of public access, allowable attorney's fees, cost of suit, and such other relief as the Court deems just and proper.

**COUNT VIII — Class Injunctive and Declaratory Relief**
**(§ 1983 — Gutierrez Individually and in Official Capacity)**

106. Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as if fully set forth herein.

107. On behalf of the class, Plaintiffs seek injunctive and declaratory relief under Rule 23(b)(2).

108. Gutierrez's pattern of using ARDC disciplinary authority to retaliate against attorneys who report on her personal cases, observe judicial proceedings involving her, or publicly comment on judicial and attorney misconduct constitutes action on grounds generally applicable to the class.

109. The hearing board chair's effective rebuke of Gutierrez's operation for retributive judge-protection conduct confirms the pattern when the hearing board chair admitted that Gutierrez and her team entered an order on his behalf without his express authorization to protect judicial employees (such as herself and judges) against those who report on judicial employees (like Plaintiffs).

110. Injunctive relief barring Gutierrez from participating in any ARDC prosecution in which she has a personal conflict - including any matter involving attorneys who have reported on, observed, or commented upon her personal court cases as a judicial employee or reasonably plan to do so for themselves or client-based work for the media - is appropriate as to the class as a whole.

**WHEREFORE**, as to Count VIII, Plaintiffs respectfully request that this Court, on behalf of the class, enter injunctive and declaratory relief barring Gutierrez from participating in any ARDC prosecution in which she has a personal conflict, costs of suit, allowable attorney's fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**TRIAL BY JURY DEMANDED HEREWITH**

---

Respectfully submitted,

*/s/ Antonio Valiente*

Antonio E. Valiente-Rivera
N.D. Ill. Gen. Bar No.: 12326
Torre de La Reina - Suite 203
450 Avenida de La Constitucion
San Juan, Puerto Rico 00901
Tel: (787) 782-9544
Email: lcdoavaliente@live.com
*Attorney for Plaintiffs*[7]

*Undersigned counsel is admitted to practice before this Court pursuant to the General Rules of the United States District Court for the Northern District of Illinois.*

[7] All facts as alleged herein are as reported by Plaintiffs, public records, and reasonable inferences therefrom.